J-S12038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                          :  PENNSYLVANIA
                              :
            v.                       :
                              :
                              :
ANTHONY WASHINGTON         :
                              :
          Appellant         :  No. 294 EDA 2019

Appeal from the Judgment of Sentence Entered February 11, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010630-2011

BEFORE:   SHOGAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                  **FILED APRIL 28, 2020**

Appellant, Anthony Washington, appeals from the judgment of sentence of life without the possibility of parole, which was imposed after his convictions at a bench trial for: murder of the first degree; conspiracy to commit murder; retaliation against witness, victim or party; firearms not to be carried without a license; carrying firearms on public streets or public property in Philadelphia; and possessing instruments of crime.[1] We affirm.

The facts underlying this appeal are as follows.

[O]n May 12, 2009, [Andrew Smallwood] robbed [Malik] Martin at gunpoint. Following [Smallwood]'s subsequent apprehension and arrest, Martin positively identified [Smallwood] as the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 903, 4953(a), 6106(a)(1), 6108, and 907(a).

perpetrator and provided the police with a formal statement confirming that fact.

\* \* \*

On March 15, 2010, [Smallwood] entered a negotiated guilty plea to one count of firearms not to be carried without a license in connection with the May 12, 2009 robbery of Malik Martin. [Smallwood] was subsequently sentenced to 9 to 23 months' imprisonment, followed by 24 months' probation, and was released after approximately seven months.

On the morning of September 16, 2010, [Smallwood] shot and killed Martin's best friend, Rasul Gresham.

*Commonwealth v. Smallwood*, No. 726 EDA 2015, unpublished memorandum at 1-2, 6 (Pa. Super. filed September 12, 2016) (citations to the record omitted) (footnote omitted); *see also* Trial Court Opinion, dated July 19, 2016, at 2-4 (citing N.T. Trial, 2/9/2016, at 50-52, 54-59, 63-64, 84-85, 90) & 11 n.7.

On September 29, 2010, Martin went to the Homicide Unit at 8th and Race Streets and asked to speak to Detective [George] Pirrone. The details of the conversation between the detective and [Martin] were memorialized in an activity sheet. Detective Pirrone tried to "coax" Martin "to go on paper and give a formal interview," but he was not willing.

Martin told Detective Pirrone that he wanted to talk about his friend, Rasul Gresham. Gresham and he "were having some problems with some males in the area maybe between 56th Street and 59th Street area and they were having problems with these guys for a little while and he wanted to tell [] [the detective] about it." Martin identified the "guys" as Defendant, Anthony "Peanut" Washington, and co-defendant, Andrew Smallwood.

Trial Court Opinion, dated July 19, 2016, at 12 (citing N.T., 2/11/2016, at 11-24).

"Thereafter, on April 6, 2011, Martin was shot multiple times in his head and left forearm as he sat in his vehicle. . . . Video surveillance from a nearby business captured [Smallwood] and Washington hiding behind Martin's vehicle moments before the shooting." *Smallwood*, No. 726 EDA 2015, at 2 (citations to the record omitted); *see also* Trial Court Opinion, dated July 19, 2016, at 4. "Seconds after the gunshots stopped, [Officer Robin Summers] observed a black male in a grey sweatshirt run" away from the crime scene; the parties would later stipulate at trial that Washington "was included as a source of the major component of the DNA mixture detected in two samples taken from the grey hoodie." Trial Court Opinion, dated July 19, 2016, at 5, 9 (citing N.T. Trial, 2/9/2016, at 112-19; N.T., 2/11/2016, at 25-26). Officer Marc Peterson "stopped [Washington] minutes after the shooting less than two blocks from the scene;" Washington was "breathing a little heavy" with "his heart . . . pounding a little bit." *Id.* at 6-7, 11 (citing N.T., 2/10/2016, at 48-52, 56-57).

> Martin subsequently died as a result of his injuries on April 13, 2011. . . . [Smallwood] was subsequently arrested and charged with first-degree murder and related offenses in connection with these two homicides. Washington was also charged in connection with the murder of Martin, but was not charged in the murder of Gresham. On December 3, 2013, the Commonwealth filed a motion to consolidate these cases on the basis that both murders stemmed from [Smallwood]'s robbery of Martin and that each murder was relevant to prove [Smallwood]'s motive for the other. Following a hearing, the trial court granted the Commonwealth's motion on December 9, 2013. Thereafter, on October 13, 2014, Washington's counsel filed a pre-trial motion to sever his case from that of [Smallwood]. The trial court granted this motion, in part, on February 3, 2015.

***Smallwood***, No. 726 EDA 2015, at 2-3 (citations to the record omitted).

On February 8, 2016, Washington submitted a filing that he entitled an "Omnibus Motion" but only included a motion to suppress evidence. The motion consisted of a boilerplate form with every box underneath the heading "Suppress of Evidence" checked but without any mention of what specific evidence Washington wanted suppressed. At the suppression hearing, defense counsel argued:

> [M]y client was stopped from walking down the street, and a police officer placed his hand on his chest. And as he previously testified and as discovery indicates, he felt a rapid heart beat. The act of placing a hand on someone's chest is a search within the meaning of the 4th Amendment.

N.T., 2/8/2016, at 5.

During the hearing, Officer Marc Peterson of the Philadelphia Police Department testified that he saw Washington "a little less than two blocks from" the crime scene within 30 seconds to a minute after receiving a "foot pursuit" radio report from another officer that two suspects, both of whom were wearing hoodies, were running from the scene of a shooting. ***Id.*** at 16-17, 19, 27. Officer Peterson stated that, when he first saw Washington, he found it unusual that Washington was only wearing a T-shirt in 54-degree weather. ***Id.*** at 19; N.T., 2/9/2016, at 9. He testified that he "thought it was just a little too cold for wearing just a T-shirt" and that Washington may have taken off his hoodie. N.T., 2/8/2016, at 19. He explained that, in his experience as a police officer for 13 years, "whenever you hear a flash of a jacket or a hoodie, a lot of times someone would take that off." ***Id.*** Officer

Peterson further testified that, when he exited his patrol vehicle, Washington immediately put up his hands. *Id.* at 20.

The officer's testimony continued as follows:

**A.** As I'm walking over to him, I'm looking at him. I could see that he was breathing a little heavy. So I put my hand on his chest.

**Q.** For what purpose?

**A.** [J]ust wanted to see if his heart was beating fast.

**Q.** And what was the purpose of that, sir?

**A.** It's just an indication that he may have been running.

**Q.** Okay. How was his heart beating?

**A.** It was beating fast and rapidly.

**Q.** Consistent with the breathing that you observed?

**A.** Yes. . . .

**Q.** And I believe you described his heart rate as fast or rapid, correct?

**A.** Yes.

**Q.** And that's the first observation -- well, strike that. Was that the first observation that you made that he might have been running in your opinion?

**A.** Just the heavy breathing before that.

**THE COURT:** When did you notice the heavy breathing?

**THE WITNESS:** When I was walking up to him. . . .

**Q.** Also, I believe if you refer to the first statement, counsel made reference to a statement that you gave to Southwest Detectives at 2:15, right after you stopped the individual, right?

**A.** Yes.

**Q.** I will just cut to the chase. "I, along with my partner, stopped this male for investigation, and felt his chest and observed it breathing heavily."

So as soon as you speak to Southwest Detectives, you tell them about this heavy breathing on the street as well that you have told us about, right?

**A.** Yes, sir.

N.T., 2/8/2016, at 20, 33, 50.

During closing arguments at the suppression hearing, defense counsel contended:

[T]his was an arrest without probable cause. . . . [A]t the time that Officer Peterson approached, he placed his hand on my client's chest, and his testimony was that he felt a rapid heart rate at that time. That, in and of itself, is a search. . . . I will concede that he was breathing heavily.

N.T. Suppression, 2/9/2016, at 10-12.

The trial court denied the suppression motion. *Id.* at 31.

On February 11, 2016, Washington was convicted of the aforementioned crimes and immediately sentenced. During its findings of fact and conclusions of law at the close of the trial, the trial court made no mention of Martin's conversation with Detective Pirrone, *see* N.T., 2/11/2016, at 88-94, but stated: "[Appellant] was caught and you don't even need the robbery." *Id.* at 92.

On July 2, 2018, Washington filed a petition pursuant to the Post Conviction Relief Act ("PCRA").[2] On January 3, 2019, upon agreement of the

---

[2] 42 Pa.C.S. §§ 9541–9546.

parties, the PCRA court granted relief and reinstated Washington's direct appeal rights *nunc pro tunc*. On January 24, 2019, Washington filed this timely direct appeal. Washington filed his statement of errors complained of on appeal on February 24, 2019. The trial court entered an opinion on March 29, 2019, stating that its prior opinion, dated July 19, 2016, would serve as its opinion pursuant to Pa.R.A.P. 1925(a).[3]

Washington presents the following issues for our review:

[1.] Did the trial court err and/or abuse its discretion when it permitted the Commonwealth to present evidence consisting of statements made by the decedent Malik Martin where:

- the statements should have been precluded as hearsay; and

- the statements related to other acts of defendant and should have been precluded as violative of Rule of Evidence 404(b)?

[2.] Did the trial court err and/or abuse its discretion when it permitted the Commonwealth to present evidence consisting of prior crimes committed by the codefendant which was unduly prejudicial, and that prejudice (substantially) outweighed the probative value (if any) of the evidence?

[3.] Did the trial court err and/or abuse its discretion when it denied [Washington]'s motion to suppress?

Washington's Brief at 4 (suggested answers and trial court's answers omitted).

---

[3] The trial court opinion dated March 29, 2019, also explained the appeal's procedural history after July 19, 2016.

Washington contends that "the trial court erred and abused its discretion when it admitted statements made by [Martin.]" *Id.* at 33. Washington "challenges this decision on multiple grounds[,]" arguing that the statements are (1) "hearsay that does not fall within any exception to the rule prohibiting hearsay" and (2) "precluded by Rule of Evidence 404(b)." *Id.*

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. . . . Evidence is admissible if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact—and its probative value outweighs the likelihood of unfair prejudice.

*Commonwealth v. Clemons*, 200 A.3d 441, 474 (Pa. 2019) (citations omitted).

Hearsay "is an out-of-court statement offered to prove the truth of the matter asserted in the statement. The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement." *Commonwealth v. Chmiel*, 889 A.2d 501, 532 (Pa. 2005) (citation omitted). Even if a court erred by admitting hearsay, the appellant must

still establish that the court's error was reversible error. ***In re M.T.***, 607 A.2d 271, 280-81 (Pa. Super. 1992) (*per curiam*).[4]

Rule 404(b) of the Pennsylvania Rules of Evidence states:

**(b) Crimes, Wrongs or Other Acts.**

> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2). We further note that even erroneously admitted evidence of "bad acts" will not necessarily require a new trial:

> Not all improper references to prior bad acts will mandate a new trial, however. Mere passing reference to criminal activity will not require reversal unless the record indicates that prejudice resulted from the reference. Harmless error is present when the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.

***Commonwealth v. Stafford***, 749 A.2d 489, 496-97 (Pa. Super. 2000) (internal citations omitted).

---

[4] We may rely on cases predating the enactment of the Pennsylvania Rules of Evidence to the extent they comport with the Rules. ***Commonwealth v. Aikens***, 990 A.2d 1181, 1185 n.2 (Pa. Super. 2010).

A review of the record discloses that the trial court did not rely on any of Martin's conversation with Detective Pirrone in reaching its decision:

> There was sufficient and compelling evidence of [Washington]'s guilt in this case. Given the strength of the other evidence, including DNA evidence linking [Washington] to the crime and the testimony of the officers who arrested [Washington] less than two blocks away from the scene within seconds of the shooting, any prejudice to [Washington] resulting from the admission of this evidence was *de minimis*. Moreover, the risk of Martin's statements being given undue weight by the fact finder was minimized since this case was not tried before a jury.
>
> There is no indication on the record that the court placed undue emphasis on Martin's statements to Detective Pirrone. In fact, the court made no mention of this evidence in its findings of fact and conclusions of law at the close of trial.

Trial Court Opinion, dated July 19, 2016, at 14-15 (citing N.T., 2/11/2016, at 88-94). Therefore, even if Martin's conversation with Detective Pirrone was improperly admitted hearsay and "prior bad acts" evidence (an issue we need not reach), the admission of that evidence was harmless, and we fail to see error sufficient to justify reversal of the trial court's judgment. *See* ***Commonwealth v. Hairston***, 84 A.3d 657, 671 (Pa. 2014) ("the harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial" (citations omitted)). As noted, we defer to a trial court on evidentiary issues. ***Clemons***, 200 A.3d at 474. We see no clear abuse of discretion here. Apart from that deference, we conclude that any error that might have occurred was harmless when viewed in the context of the entire record.

Next, Washington argues that "the trial court erred and abused its discretion when it admitted evidence relating to [Smallwood]'s alleged robbery of [Martin] . . . in 2009." Washington's Brief at 39. Washington "submits that it was error to admit this evidence because it unduly prejudicial to him and, that prejudice is outweighed by the probative value, if any, of the evidence at issue." *Id.* He additionally asserts that "the trial court even acknowledged that the robbery evidence had virtually no probative value with respect to the charges at issue in the matter *sub judice*. *See* N.T. 02/11/16, p. 92 (acknowledging in reaching a verdict, 'you don't even need the robbery')." *Id.* at 45 (some formatting).

Our standard of review for challenges to the admissibility of evidence remains an abuse of discretion. *Clemons*, 200 A.3d at 474.

Upon review, we conclude that the evidence that Smallwood previously robbed Martin was admissible, because it was part of the sequence of events that formed the history of this case, known as the *res gestae* or "complete story" exception. *Commonwealth v. Crispell*, 193 A.3d 919, 936 (Pa. 2018) (evidence of crimes, wrongs, or other bad acts may be admissible as *res gestae* when relevant to furnish the complete story or context of events surrounding the crime); *Commonwealth v. Murphy,* 657 A.2d 927, 932 (Pa. 1995) (evidence that defendant killed witness who saw defendant commit the murder for which he was on trial was so interwoven with the facts of the case as to be admissible under the *res gestae* exception); *Commonwealth v. Ferguson*, 107 A.3d 206, 211 (Pa. Super. 2015) (in

order for evidence of prior acts "to be admissible as evidence of motive," the acts "must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances" (citation and internal quotation marks omitted); **Commonwealth v. Flamer**, 53 A.3d 82, 87 (Pa. Super. 2012) (evidence showing that appellants conspired with a third party to kill a witness to another murder committed by appellants was admissible to prove the history of the case under the *res gestae* exception). Washington was charged not only with murder but also with retaliation against witness, victim or party.[5] A fact-finder could reasonably conclude from the record that Martin's statement to police positively identifying Smallwood as the individual who had robbed him at gunpoint caused Smallwood and Washington to kill Martin in retaliation. **See Smallwood**, No. 726 EDA 2015, at 1-2, 6; Trial Court Opinion, dated July 19, 2016, at 2-4 (citing N.T., 2/9/2016, at 50-52, 54-59, 63-64, 84-85, 90) & 11 n.7. Accordingly, the trial court, sitting as fact-finder, needed to hear the background about the Smallwood robbery and Martin's prior cooperation in that case to understand the case against Washington and to find Washington guilty of murder **and** of retaliation against witness, victim or party. Without evidence of the robbery of Martin

---

[5] "A person commits an offense if he harms another by any unlawful act or engages in a course of conduct or repeatedly commits acts which threaten another in retaliation for anything lawfully done in the capacity of witness, victim or a party in a civil matter." 18 Pa.C.S. § 4953(a).

by Smallwood and of Martin's cooperation with police thereafter, the Commonwealth could never have established Washington's motive for shooting Martin. The narrative history of the case would be nonsensical if the Commonwealth could only present **what happened** without being able to offer **why** it happened. The fact-finder would not have had the "complete story." The highly probative nature of this evidence clearly outweighs any undue prejudice arising from its admission. *See Falmer*, 53 A.3d at 87-88 ("highly probative nature of this evidence" of the history of the case and appellants' consciousness of guilt "outweighs any undue prejudice arising from its admission" (citing *Commonwealth v. Paddy*, 800 A.3d 294, 307-08 (Pa. 2002) (evidence admissible to prove motive is highly relevant in the determination of guilt))). Consequently, we discern no abuse of discretion on the part of the trial court in permitting evidence that Smallwood robbed Martin to be introduced at trial.

Finally, Washington urges this Court to find that the trial court "erred when it denied" his "motion to suppress physical evidence recovered from [him] by a police officer during a stop and frisk." Washington's Brief at 46. He continues:

> The confluence of facts and circumstances known to Officer Peterson prior to stopping [Washington], detaining him, and checking his heart rate, are insufficient to justify such a seizure and search. . . . Officer Peterson's decision to seize a person walking at a normal pace in the area of a crime who does not fit the description of either suspect reported by fellow officers is constitutionally impermissible. . . . Washington respectfully submits that under the facts of the case *sub judice*, the officer lacked reasonable suspicion to seize Mr. Washington when they

- 13 -

exited their police vehicle. . . . Walking away from police (even in a high crime area) is not sufficient to establish reasonable suspicion to initiate an investigative detention where the individual does not also **match** information provided by an anonymous tipster.[6] ***In re J.G.***, 860 A.2d [185,] 187-89 [(Pa. Super. 2004)].

***Id.*** at 56-58 (emphasis in original). The appellate brief hence appears only to challenge Officer Peterson's stop of Washington. ***See id.***

"Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous." ***Commonwealth v. Yim***, 195 A.3d 922, 926 (Pa. Super. 2018). Our scope of review from a suppression ruling is limited to the evidentiary record created at the suppression hearing. ***Commonwealth v. Fulton***, 179 A.3d 475, 487 (Pa. 2018).

At the suppression hearing, Washington contended that Officer Peterson did not have probable cause to arrest him. N.T. Suppression, 2/9/2016, at 10. In his appellate brief, Washington now argues that the officer did not have reasonable suspicion to stop him for an investigative detention; however, Washington never raised a claim before the trial court that Officer Peterson did not even have mere reasonable suspicion to stop him, as opposed to the higher hurdle of probable cause to arrest him. ***Compare*** N.T. Suppression, 2/9/2016, at 10, ***with*** Washington's Brief at

---

[6] Contrary to this assertion, this case did not involve an anonymous tipster. ***See*** N.T., 2/8/2016, at 16 (Officer Peterson heard description of suspects directly from a radio report from another police officer).

56-58; *see Commonwealth v. Parker*, 161 A.3d 357, 362 (Pa. Super. 2017) ("an 'investigative detention' must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest"; "an arrest or 'custodial detention' must be supported by probable cause" (citation omitted)).  Thus, Washington failed to preserve the issue of whether the officer had reasonable suspicion to stop him, Washington's Brief at 56-58, and this challenge is therefore waived. Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").[7]

For the reasons given above, all of Washington's appellate claims are meritless or waived.  We therefore affirm his judgment of sentence.

Judgment of sentence affirmed.

---

[7] Assuming Washington had preserved this challenge, we would still conclude that Officer Peterson had reasonable suspicion to justify an investigative detention of him.  The officer testified that he first saw Washington, who was only wearing a T-shirt that was inappropriate for the weather, less than a minute after receiving a "foot pursuit" radio report from another officer that two hoodie-wearing suspects were running from the scene of a shooting and less than two blocks from the scene of the crime. N.T., 2/8/2016, at 16-19, 27-28; N.T. Suppression, 2/9/2016, at 9.  Officer Peterson further testified that, based upon his experience as a police officer, fleeing suspects often remove an outer layer of clothing that could identify them, such as a hoodie.  N.T., 2/8/2016, at 19.  Officer Peterson added that Washington immediately put up his hands upon seeing the officer exit his patrol car.  *Id.* at 20.  All of these circumstances taken in combination demonstrate that Officer Peterson had reasonable suspicion to stop and to detain Washington for further investigation.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/28/2020